UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Zev Shlasinger and Paul Gerardi

     v.                                   Civil No. 16-cv-290-JL
                                            Opinion No. 2018 DNH 167
Daniel Yarrington and Myriad
Games, LLC


**MEMORANDUM ORDER**


Plaintiffs' post-trial motions in this contract-based action turn on whether the jury returned an internally inconsistent verdict on one count. Plaintiffs Zev Shlasinger and Paul Gerardi brought one count of fraud in the inducement of a contract and one count of breach of the same contract against defendant Daniel Yarrington and his company, Myriad Games, LLC. After a four-day trial, the jury returned a verdict for the defendants on the fraud count and for the plaintiffs on the breach of contract count. As a remedy for that breach, however, the jury awarded the plaintiffs "[z]ero dollars."

After the trial, the plaintiffs renewed their motion for judgment as a matter of law on both claims under Fed. R. Civ. P. 59(b). In the alternative, they ask the court to amend the judgment to award them damages that they did not request at trial. See id. Rule 59(e). Failing that, they seek a new trial on their breach of contract claim (or solely on damages) in

light of the jury's verdict on that claim, which they characterize as internally inconsistent.  See id. Rule 59(a)(1)(A).  As a last request, they seek a new trial in light of a juror's nondisclosure of a former connection between his company and the law firm representing the defendants.  See id.  And for their part, the defendants request an award of attorneys' fees.

The court denies the plaintiffs' Rule 50 motions, for which the plaintiffs offered no evidentiary support.  It also denies the plaintiffs' motion for a new trial, concluding that the jury's verdict on liability for the breach of contract claim was logically consistent, consistent with New York law, and consistent with the evidence.  Nor are the plaintiffs entitled to a new trial in light of the purportedly undisclosed former association between a juror and the defendants' counsel.

Concluding, however, that the plaintiffs are entitled to nominal damages on their breach of contract claim under New York law, the court grants the plaintiffs' motion to amend the judgment to the extent that it awards nominal damages.  And because this award precludes the defendants from claiming the position of "prevailing party," even if the invoked fees provision applied to this action -- which does not appear to be the case -- the defendants are not entitled to recover thereunder.

# I.  **Background**

The travel of this lawsuit begins, as so many campaigns do, with parties questing together for a common end and concludes, as so many campaigns also do, with disputes over which road to take and how to distribute the treasure.  Plaintiff Paul Gerardi, an avid gamer, wanted to open a store in his home borough of Staten Island, New York, to sell board games, card games, and associated merchandise.  He also hoped to employ the store, as is the custom in the industry, as a venue in which his customers could play the games he sold.  Zev Shlasinger, a friend of Gerardi's from gaming tournaments and a previous employer, agreed to provide financial backing for Gerardi's store.

Finding their alliance incomplete, Shlasinger and Gerardi approached Daniel Yarrington, owner and sole member of Myriad Games, LLC, a games store with locations in Manchester and Salem, New Hampshire.  Yarrington, whom Shlasinger met previously through trade shows, also operated Game Salute, a company that published and distributed board and card games. Yarrington thus brought experience as a retailer and distributor into the party, along with his existing supply chain.

## A.   The parties' agreements

Shlasinger, Gerardi, and Yarrington joined forces to create ZaP'D Games, LLC, in June 2012.[1]  The rulebook for this venture was the ZaP'D Games Operating Agreement,[2] the agreement which formed the company.  The Operating Agreement designated Shlasinger as the managing member and CEO of the company, Yarrington as Secretary, and Gerardi as Treasurer.  In the Operating Agreement, the parties also set forth their plan to share the profits:  each year, Shlasinger and Yarrington would each receive equal disbursements of the store's true net yield until they had received $100,000, after which the parties would each receive one third of the net profits.[3]

The parties each agreed to invest money and resources into the Staten Island store.  Shlasinger was to invest $100,000. Yarrington was to contribute money on an as-needed basis for the store's operating costs and inventory, up to a maximum of $100,000, as well as to provide merchandise for the store through Myriad Games's distribution systems and an operations system for ordering and managing inventory.  The parties memorialized these investments of money and resources in a

---

[1] The "Z" stands for Zev, the "P" for Paul, and the "D" for Daniel.

[2] Tr. Ex. 15.

[3] Id. at Schedule A.

separate agreement, the Store Agreement, entered into between ZaP'D Games and Myriad Games.[4]

Finally, Gerardi was to manage the day-to-day operations of the store. He also took a salary of $60,000 per year, except that for first three years of the store's operation, he would receive a salary of $30,000. The $90,000 total that he forewent in salary during those three years would represent his monetary investment in the store. Though the parties discussed Gerardi's investment before entering into the Store Agreement, it was not memorialized in that agreement or in the Operating Agreement.

### B. The Staten Island store

Though Yarrington negotiated and signed a lease for the Staten Island store in October 2012[5] and the parties hoped to open in time for the holiday season that year, the store did not open until the end of January 2013.[6] In accordance with the Store Agreement, Shlasinger contributed $50,000 to ZaP'D Games and another $50,000 to Myriad Games, for a total of $100,000.

---

[4] Tr. Ex. 14.

[5] Tr. Ex. 16. Yarrington signed the lease agreement as "CEO of ZAP'D GAMES, LLC," id., even though, under the Operating Agreement, Shlasinger was the company's CEO. Shlasinger guaranteed the lease.

[6] Hurricane Sandy's impact in September 2012 delayed the store's opening for a week or two, and it took longer than expected for Gerardi to install flooring and shelving, and otherwise prepare the store for opening.

As anticipated, Gerardi prepared the store to open and managed it.  Through Myriad Games, Yarrington provided the store with initial inventory and managed its inventory and payroll systems.

Though operating under the company name ZaP'D Games, the Staten Island store effectively functioned as a Myriad Games store.  It bore the name Myriad Games above its door, it shared inventory with other Myriad Games locations, and Myriad Games paid its costs out of its operating account.  The Staten Island store did not have a separate operating account or any separate accounting system.  Rather, Shlasinger's contributions and its sales went into Myriad Games's accounts[7] and the agreed-upon profits to be shared between Shlasinger and Yarrington came out of the same Myriad Games accounts.

According to Shlasinger and Gerardi, the store began experiencing problems relatively early.  These problems included:

- The store was not receiving copies of new and popular games, but was stocked with unpopular games from Yarrington's publishing company, Game Salute.

---

[7] An account for ZaP'D Games was opened at the Richmond County Savings Bank in 2012.  Shlasinger made his first $50,000 deposit into that account.  The money in the account was transferred to Myriad's operating account and the ZaP'D Games account was closed in December 2012, before the Staten Island store opened.

- The store received copies of some base games without that game's explanation sets or, alternatively, copies of the expansion sets without the base game.[8]

- The store did not receive popular games, even though it ran in-store tournaments for those games.

- The store received some games that were not appropriately targeted to a store in New York, such as Boston Red Sox-themed Monopoly games.[9]

- Yarrington failed to obtain a promised Pepsi refrigerator for the store (to store drinks for customers to purchase) for several months; it arrived only after Gerardi called about it.

These problems, Shlasinger and Gerardi testified, resulted in poor sales for the Staten Island store, which could not reasonably expect to sell inventory it did not have, or that was incomplete, unpopular, or inappropriately targeted to other geographic markets.

The defendants, in turn, presented evidence that Gerardi's management of the store contributed to its poor sales. Gerardi

---

[8] This would be the equivalent of offering for sale the first book in a series but not later books or, more egregiously, offering one or more of the later books but not the first book.

[9] This struck the court, and likely most jurors, as particularly unfortunate.

had never managed a retail location before and, despite training from Myriad Games and support from its staff, failed to follow certain procedures from the Myriad Games "game guide" -- its employee handbook.

Though Yarrington sent monthly statements on the amount received in sales at the Staten Island store to Shlasinger and Gerardi, the plaintiffs had difficulty obtaining other inventory and financial data from Yarrington.  Shlasinger and Gerardi were particularly troubled to learn that Yarrington had taken out a line of credit in Myriad Games's name in April 2013 and used Shlasinger's second payment of $50,000 in July 2013 to pay down the loan and extend his credit.  As a response of questionable legality and judgment, Gerardi twice took home money, totaling approximately $10,000, from the Staten Island store's cash register.  He did so, he explained, to see if Yarrington would notice and to demonstrate that Yarrington was ignoring the financial state of the Staten Island store.  He returned the money after several weeks.

In accordance with the Store Agreement, at the end of 2013, Myriad Games paid ZaP'D Games Shlasinger's half of the seven percent of the Staten Island store's total earnings that year. But the Staten Island store still had not turned a profit.  That December, Yarrington and Shlasinger discussed, by email, how to move forward.  Yarrington proposed two options:  either Myriad

Games could continue to run the store in accordance with the Store Agreement, reserving the sole discretion to close it if it continued to perform poorly, or Shlasinger and Gerardi could buy out the inventory, rename the store, and operate it themselves. Shlasinger chose the first option.

Around the same time, Yarrington terminated Gerardi from his position as manager of the Staten Island store. At trial, he explained Gerardi's termination as a result of Gerardi's admitted theft, his failure to follow Myriad Games policies, and the store's generally poor performance. He replaced Gerardi with Paul Yellovich, a friend of Gerardi's and one of the store's employees.

The Staten Island store never turned a profit. Both Yellovich and a regular visitor to the store described it as poorly managed after Gerardi's departure. At the end of April 2014, Yarrington unilaterally, and without informing Shlasinger or Gerardi, wound up the store's business assets and closed it. More specifically, he staged a raid: he and several employees of his New Hampshire stores visited the Staten Island location in the middle of the night, removed the merchandise, destroyed shelves that Gerardi had built for the store, and drove back to New Hampshire.

**C.    The trial**

The plaintiffs brought two claims before the jury:  one count of fraud in the inducement of the Operating Agreement and one count of breach of the Operating Agreement.[10]  Before trial, the plaintiffs submitted their proposed jury instructions.  With respect to their fraud in the inducement claim, they sought an instruction on reliance damages.[11]  On the breach of contract claim, they proposed an instruction on expectation damages.[12]  Though the court did not adopt the plaintiffs' language, it did adopt the substance of the plaintiffs' proposed damages instructions, which it found consistent with New York law and the New York pattern jury instructions.  The plaintiffs never objected to these instructions nor requested any other damages

---

[10] At no point, either in the complaint or during trial, did the plaintiffs allege that the defendants fraudulently induced or breached the Store Agreement, or bring any claim based on that Agreement.  This is significant because the defendants request attorneys' fees under the Store Agreement, not the Operating Agreement.

[11] Plaintiffs' Proposed Jury Instructions (doc. no. 53) at 4 ("Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained.").

[12] Id. at 7-8 ("The law awards damages for breach of contract to compensate for injury caused by the breach — injury which was foreseeable, in other words, reasonably within the contemplation of the parties, at the time the contract was entered into. Money damages are substitutional relief designed in theory to put the injured party in as good a position as he would have been put by full performance of the contract.").

instruction, such as an alternative instruction on reliance damages for their breach of contract claim.  Nor did either party request an instruction on nominal damages.

Both claims went to the jury, which returned a verdict against the plaintiffs on their fraud in the inducement claim. And though the jury found that the defendants had breached the Operating Agreement, it awarded "zero dollars" in damages to the plaintiffs for that breach.

### D.   Post-trial motions

The plaintiffs moved for judgment as a matter of law on both claims.[13]  See Fed. R Civ. P. 50(a).  In the event the court denied that motion (as it now does), they also ask the court for relief on their breach of contract claim, on which the jury found the defendants liable but awarded plaintiffs no damages. See Fed. R. Civ. P. 50(b).  Specifically the plaintiffs ask the court either to grant an entirely new trial, or at least a new trial on damages, see Fed. R. Civ. P. 59(a), or to adjust the damages award to reflect the jury's liability conclusion, see id. Rule 59(e).  Finally, the plaintiffs move for a new trial on grounds of alleged juror misconduct.  The court addresses each of these motions in turn.

---

[13] The defendants also moved for judgment as a matter of law under Rule 50, but withdrew their motion after trial in light of the jury's verdict.

## II. **Plaintiffs' motion for judgment as a matter of law**

"Under Federal Rule of Civil Procedure 50, the court may grant judgment as a matter of law to a party on an issue if 'the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party on that issue.'" T G Plastics Trading Co. v. Toray Plastics (Am.), Inc., 775 F.3d 31, 37 (1st Cir. 2014) (quoting Fed. R. Civ. P. 50). "'[A] party seeking to overturn a jury verdict faces an uphill battle,' since '[c]ourts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party.'" Id. (quoting Monteagudo v. Asociación de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 170 (1st Cir. 2009)).

Plaintiffs moved at the appropriate times during trial for judgment as a matter of law on both of their claims.[14] Specifically, and as permitted by the court,[15] they filed an ex

---

[14] Plaintiffs' Rule 50 Mot. (doc. no. 66).

[15] See Final Pretrial Order (doc. no. 60) ¶ 20. The purpose of this practice, employed frequently by this court in jury trials, is to apprise the court, in advance, of the specific grounds and arguments the parties expect to advance under Rule 50 later in the trial. The plaintiffs' later Rule 50 motions in this case contained no argument or evidentiary citations not contained in this memorandum.

parte memorandum in support of their expected Rule 50 motion at the beginning of the trial.  In accordance with this court's practice,[16] that motion was unsealed and provided to defense counsel, and defense counsel was afforded an opportunity to object, at the close of the plaintiffs' case in chief.  The court took the motion under advisement.  It now addresses -- and denies -- the plaintiffs' motion on both counts.[17]

### A.    Fraud in the inducement (Count 1)

The plaintiffs first claimed fraud in the inducement of the Operating Agreement.  The plaintiffs moved for judgment as a matter of law on this claim, see Fed. R. Civ. P. 50(b), on two theories, only one of which they alleged in their complaint. Neither theory merits judgment in the plaintiffs' favor.

### 1.    Reliance on misrepresentations

First, the plaintiffs contend that they are entitled to judgment as a matter of law on their claim for fraud in the

---

[16] See id.

[17] At the conclusion of the trial, the court asked plaintiffs' counsel whether plaintiffs wished to proceed with this motion. The plaintiffs' local counsel, not knowing whether plaintiffs wished to proceed, represented that counsel would contact the court with an answer in short order.  The court heard nothing from counsel until plaintiffs filed this motion, requesting that the court rule on their Rule 50 motion.  To the extent the plaintiffs intend to suggest that the court has been slow to rule on their motion for any reason other than counsel's failure to respond to the court's query, they are incorrect.

inducement in its traditional form.  That is, where one party

makes a promise as to future action for the purpose of inducing

the other to enter into a contract, knowing at the time that the

promise was made that he did not intend to fulfill that promise,

and then does not fulfill that promise, a party who relies on

that promise to his detriment may recover for fraud.  See Centro

Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V., 952

N.E.2d 995, 1000 (N.Y. 2011).

The plaintiffs argue that they introduced evidence

sufficient to prove this claim by demonstrating the defendants

made certain representations for the purpose of inducing the

plaintiffs to rely on those representation in entering into the

Operating Agreement, and that the plaintiffs did so to their

detriment.[18]  They do not, however, cite or even refer in a

general sense to the evidence that they contend is sufficient to

entitle them to judgment as a matter of law.[19]  A motion under

Rule 50 "must specify the judgment sought and the law and facts

that entitle the movant to the judgment."  Fed. R. Civ.

P. 50(a)(2) (emphasis added).  Absent such support, plaintiffs'

---

[18] See Plaintiffs' Rule 50 Mot. (doc. no. 66) ¶¶ 7-11.

[19] See id.; see also Plaintiffs' Request for Ruling on Rule 50
Motion and Incorporated Motion for Corrected Judgment and/or for
Partial or Complete New Trial ("Plaintiffs' Mem.") (doc. no. 79)
(renewing, but not supplementing, Rule 50 motion made at trial).

motion amounts to a mere recitation of their claim, and accordingly must be denied.

Furthermore, to the extent that the record contains such evidence, it cannot be said that a reasonable jury would not have a legally sufficient evidentiary basis to find for the defendants on the plaintiffs' fraud in the inducement claim. See T G Plastics, 775 F.3d at 37.  The plaintiffs bore the burden of proving the elements of that claim.  A reasonable jury could have found, based on the evidence adduced at trial, that the plaintiffs failed to carry that burden.  The court is disinclined, especially absent the plaintiffs' reliance on any specific evidence, to conclude otherwise.

### 2.  Fiduciary duty

The plaintiffs also moved for judgment on the pleadings on a claim for fraud in the inducement on the theory that defendants concealed information that they had a fiduciary duty to disclose.[20]  The plaintiffs did not plead this claim in their complaint nor seek to add it to the action until, midway through the trial, they moved to amend their complaint to conform to the evidence.[21]  The court denied that motion from the bench.

---

[20] Plaintiffs' Rule 50 Mot. (doc. no. 66) ¶¶ 15-26.

[21] Plaintiffs' Mot. to Amend (doc. no. 69).

Under Rule 15(b), a party may move to amend the pleadings to conform them to the evidence "when an issue not raised by the pleadings is tried by the parties' express or implied consent . . . ." The defendants in this case did not expressly consent. Nor did they impliedly consent by "acquiesce[ing] in the introduction of evidence which is relevant only to" the plaintiffs' new claim. DCPB, Inc. v. City of Lebanon, 957 F.2d 913, 917 (1st Cir. 1992) (emphasis added) (internal quotations omitted). As the court explained on the record, the evidence relied on by the plaintiffs was relevant to their breach of contract claim. "The introduction of evidence directly relevant to a pleaded issue cannot be the basis for a founded claim that the opposing party should have realized that a new issue was infiltrating the case." Id. The plaintiffs' breach of fiduciary duty-based claim was thus never properly before the court or the jury. The court accordingly denies the plaintiffs' Rule 50 motion on that theory as well.

**B. Breach of the Operating Agreement (Count 2)**

The jury's verdict in the plaintiffs' favor on their claim for breach of contract renders moot the plaintiffs' motion for judgment as a matter of law on that claim.[22] The court denies it as such.

---

[22] Plaintiffs' Rule 50 Mot. (doc. no. 66) ¶¶ 27-34.

Even were it not rendered moot by the jury's verdict, the plaintiffs' motion lacked any evidentiary support, and thus fails to satisfy Rule 50(a)(2).  The plaintiffs merely repeated the allegations in their complaint concerning which provisions of the Operating Agreement the defendants allegedly breached, without recounting any evidence of the breach.  Nor does the plaintiffs' mere citation to the law of reliance damages -- which, as discussed _infra_ Part III.C, the plaintiffs surrendered when they agreed to a jury instruction on expectation damages -- without more afford them any relief.

## III. __Motion for a new trial__

Following a jury trial, this court may "grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "A trial court may grant a new trial on the basis that the verdict is against the weight of the evidence," or "whenever, in its judgment, the action is required in order to prevent injustice."  Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009).  Its discretion is limited, however, in that it "may not grant a motion for a new trial merely because [it] might have reached a conclusion contrary to that of the jurors . . . ."  Conway v. Electro Switch Corp., 825 F.2d 593, 598-99 (1st Cir. 1987).

The plaintiffs move for a new trial on the basis that the jury's verdict on that claim was internally inconsistent.[23] In returning its verdict, the jury answered "Yes" to the question "Do you find that the plaintiffs have proven, by a preponderance of the evidence, their claim for breach of the Operating Agreement?"[24] It then awarded "Zero dollars" to the plaintiffs on their claim for breach of contract.[25] Though they raised no objection at the time, the plaintiffs now argue that, under New York law, a jury cannot consistently conclude that a plaintiff has proven all of the elements of a breach of contract claim while at the same time awarding zero damages, as the jury did in this case.

Concluding as it does that the jury's verdict is logically consistent under New York law, consistent with the jury instructions (to which the plaintiffs did not object), and not against the weight of the evidence, the court denies the plaintiffs' motion for a new trial.

**A.   Logical consistency under New York law**

Under New York law, "the essential elements of a cause of action to recover damages for breach of contract" are "the

---

[23] Plaintiffs' Mem. (doc. no. 79) ¶¶ 23-38.

[24] Jury Verdict (doc. no. 74) at 2.

[25] Id.

existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." JP Morgan Chase v. J.H. Elec. of New York, Inc., 893 N.Y.S.2d 237, 239 (N.Y. App. Div. 2010). The court so instructed the jury.[26] Without more than a statement of the elements of the claim, which is all that the plaintiffs invoke, the verdict does appear to be internally inconsistent on its face, as the plaintiffs argue. A more thorough consideration of New York law, however, suggests that it is not.

As an initial matter, the plaintiffs failed to preserve their objection to the verdict's alleged logical inconsistency. "'[O]bjections to inconsistences in the verdict must be lodged 'while the jury is still in the box,' or the issue is forfeited." Smith v. Jenkins, No. 07-CV-12067-RGS, 2011 WL 1660577, at *2 n.3 (D. Mass. May 3, 2011), aff'd, 732 F.3d 51 (1st Cir. 2013) (quoting Correia v. Fitzgerald, 354 F.3d 47, 57 (1st Cir. 2003)). The plaintiffs lodged no such objection, therefore forfeiting it.

For the sake of completeness, however, the court addresses their argument, which runs as follows. By finding for the plaintiffs on the breach of contract claim, the jury necessarily found that the plaintiffs proved each element of the claim by a

---

[26] Jury Instructions (doc. no. 71) at 21.

preponderance of the evidence.  If damages is a necessary element of that claim, then by finding for the plaintiffs, the jury necessarily found that the plaintiffs proved that they were damaged by the appropriate quantum of evidence.  But, by awarding zero damages, the jury also appears to have found that the plaintiffs did <u>not</u> prove, by a preponderance of the evidence, that they were damaged.  Ordinarily, "[w]hen a jury's verdict is internally inconsistent, the trial court must direct either reconsideration by the jury or a new trial."[27] Sabarese v. Bd. of Educ. of Tuxedo Union Free Sch. Dist., 55 N.Y.S.3d 432, 433 (N.Y. App. Div. 2017).  On that basis, the plaintiffs request such relief.

A deeper exploration of New York law suggests, however, that the jury's breach-of-contract verdict is not in fact logically inconsistent.  Under New York law, "a party's rights in contract arise from the parties' promises and exist independent of any breach."  Kronos, Inc. v. AVX Corp., 612 N.E.2d 289, 292 (N.Y. 1993).  New York recognizes nominal damages as a remedy for breaches of contract, allowing a plaintiff to recover "even if the breach of contract caused no loss or if the amount of loss cannot be proven with sufficient

---

[27] Neither party requested reconsideration at the time the jury rendered its verdict.

certainty . . . ." Hirsch Elec. Co. v. Cmty. Servs., Inc., 536 N.Y.S.2d 141, 142 (N.Y. App. Div. 1988); see also Kronos, 612 N.E.2d at 292-93.

This is in sharp contrast to tort claims, where "damage is an essential element of the tort," and as such "the claim is not enforceable until damages are sustained." Kronos, 612 N.E.2d at 292. Thus, to prove a tort claim, a plaintiff must prove damages as an element of the claim itself; without proof of injury, a tort claim will not lie. In contract, however, the breach of the contract itself constitutes the injury (the damage) and gives rise to the claim; a plaintiff then must prove the amount of damages due him as a remedy for that injury.[28]

New York's pattern jury instruction on breach of contract, which the court gave to the jury in this case, bears out this distinction. It provides that the jury "will find for the

---

[28] Though the plaintiffs cite a number of extrajurisdictional cases in support of their argument, see Plaintiffs' Mem. (doc. no. 79) ¶¶ 25-28, none of those cases address internally inconsistent verdicts in contract actions. See Thomas v. Stalter, 20 F.3d 298, 303 (7th Cir. 1994) (excessive force); Brooks v. Brattleboro Mem'l Hosp., 958 F.2d 525, 529 (2d Cir. 1992) (negligence); Wright v. Hoover, 329 F.2d 72, 76 (8th Cir. 1964) (wrongful death); In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordination Pretrial Proceedings, No. 14 C 1748, 2017 WL 6569632, at *8 (N.D. Ill. Dec. 22, 2017) (products liability); Bushey v. French, 108 N.W.2d 237, 238 (Neb. 1961) (personal injury); Klein v. Miller, 77 P.2d 1103, 1104 (Or. 1938), overruled by Fischer v. Howard, 271 P.2d 1059, 1069-70 (Or. 1954) (personal injury); McLean v. Sanders, 7 P.2d 981, 981 (Or. 1932) (false imprisonment).

plaintiffs on their breach of contract claim" if it concludes
that the plaintiffs proved the first three elements by a
preponderance of the evidence -- that is, existence of a
contract, plaintiffs' performance, and defendants' breach. N.Y.
Pattern Jury Instr. - Civil § 4:1; see also Bellinson Law, LLC
v. Iannucci, 983 N.Y.S.2d 21, 22 (N.Y. App. Div. 2014)
(presenting only the first three elements as interrogatories to
the jury).  Only after those three elements are proven does it
permit the jury to "go on to consider the plaintiffs' damages in
accordance with" the court's instructions" on that issue.  N.Y.
Pattern Jury Instr. - Civil § 4:1.

Thus, a verdict would be logically inconsistent had the
jury returned a verdict for the plaintiffs despite concluding
that the plaintiffs had not met their burden of proof on one of
the first three elements of the contract claim -- that is, that
a contract existed between the parties, the plaintiffs performed
their obligations, and the defendants failed to perform theirs.
Bellinson Law, 983 N.Y.S.2d at 23-24 (verdict logically
inconsistent where jury concluded that contract existed and
defendants owed under the contract, but not that the plaintiffs
performed their obligations).  Here, however, the jury could,
with logical consistency and consistent with New York law, have
found those first three elements in the plaintiffs' favor and,
accordingly, the fourth -- that the plaintiffs were damaged by

the breach -- but concluded, at the same time, that the
plaintiffs failed to prove the amount of their damages.

**B.  Consistency with the jury instructions**

Such a conclusion would also be, and was, consistent with
the court's instructions to the jury.  Following the New York
pattern jury instructions, the court instructed the jury that
the plaintiffs had

> the burden of proving the following four elements by a
> preponderance of the evidence:
>
> (1) the existence of a contract between the
> plaintiffs, on the one hand, and either Mr. Yarrington
> or Myriad Games, on the other;
>
> (2) that the plaintiffs did what they were required to
> do under that contract;
>
> (3) that Mr. Yarrington, either individually or as an
> agent for Myriad Games, breached that contract by not
> doing what was required under the contract; and
>
> (4) that Mr. Shlasinger and Mr. Gerardi sustained
> damages because of that breach.[29]

See N.Y. Pattern Jury Instr. – Civil § 4:1 (emphasis added).  At
the liability stage, the court also instructed the jury,
consistent with New York law and without objection by the
plaintiffs, not that it had to find that the plaintiffs proved
the amount of damages they sustained, but simply that they
sustained damages by the plaintiffs' breach.  Also consistent

---

[29] Jury Instructions (doc. no. 71) at 21.

with the New York pattern instructions, the jury was instructed that, if it found all of the claim's elements, it must "find for the plaintiffs on their breach of contract claim and will go on to consider the plaintiffs' damages in accordance with the instructions provided below."[30]  See N.Y. Pattern Jury Instr. - Civil § 4:1.

The court then gave the jury an instruction on contract damages consistent with the parties' proposed jury instructions on expectation damages.  Specifically, the jury was told that, if they found for the plaintiffs on that claim, the jury should

> award them damages that put them in as good a position
> as they would have been if the contract had been fully
> performed.  You should compare the position of the
> plaintiffs as a result of the violation of Mr.
> Yarrington's or Myriad Games's contractual
> obligations, to the position that the plaintiffs would
> have been in had Mr. Yarrington or Myriad Games fully
> performed his or its contractual obligations.  You may
> award to the plaintiffs only those damages which the
> defendants, at the time the contract was made, had
> reason to foresee as the probable result of the
> violation of those contractual obligations.[31]

---

[30] Jury Instructions (doc. no. 71) at 22-23.  See also id. at 24 ("To find in favor of the plaintiffs on their claim for breach of contract, you must find that they have proven each of the elements of that claim by a preponderance of the evidence.  If you find that the plaintiffs have failed to prove one or more of the elements of a claim by the requisite quantum of evidence, then you must find in favor of the defendants on that claim.  If you find that the plaintiffs have proven all of the elements of either or both of their claims by the appropriate quantum of evidence, then you will go on to consider what, if any, damages to award them on that claim.").

[31] Jury Instructions (doc. no. 71) at 27.

And, of course, the court instructed the jury that "[t]he plaintiffs have the burden of proving the amount of their damages . . . by a preponderance of the evidence."[32]

Consistent with these instructions, the verdict form asked the plaintiffs, first, whether the jury found "that the plaintiffs have proven, by a preponderance of the evidence, their claim for breach of the Operating Agreement," and, only if they so found, it asked:  "[w]hat amount of damages, if any, do you award to the plaintiffs on their claim for breach of contract?"[33]

The plaintiffs never objected to the court's instructions on the breach of contract claim or damages, or to the special verdict form.  Where "any ambiguity was discoverable on the face of the charge," the appropriate time for the plaintiffs to object is "at the close of the charge." Merch. v. Ruhle, 740 F.2d 86, 91 (1st Cir. 1984) (quoting Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 592 (1st Cir. 1979)); see also Fed. R. Civ. P. 51(c)(2).  "To move for a new trial on the basis of inconsistency of the verdict when an unobjected to instruction permitted the alleged inconsistency, falls within the prohibition of Rule 51." Merch., 740 F.2d at 91.  Accordingly,

---

[32] Id. at 26 (emphasis added).

[33] Jury Verdict (doc. no. 74) at 2.

like their objection to the verdict's alleged logical inconsistency, they have forfeited any objection to the verdict's alleged inconsistency with the instructions. Even if they had not, however, the verdict is consistent with the court's instructions.

The jury first considered the plaintiffs' breach of contract claim. Presumably, it first found that the plaintiffs proved the existence of a contract, the plaintiffs' performance, and the defendants' failure to perform. And as discussed supra, under New York law, the jury may have found that the plaintiffs were damaged by the defendants' very failure to perform -- the breach. As instructed, only then did it move on to consider the amount of damages proven by the plaintiffs as a remedy for that breach. See Richardson v. Marsh, 481 U.S. 200, 206 (1987) (invoking "the almost invariable assumption of the law that jurors follow their instructions.").

The jury could, therefore, consistent with these instructions, have found that the plaintiffs proved their breach of contract claim and, thus, that they were damaged because damage is inherent in the breach, but at the same time concluded that the plaintiffs failed to prove the amount of their expectation damages.

**C. Verdict consistent with the evidence**

Finally, the plaintiffs argue that such a verdict is inconsistent not with the evidence of the plaintiffs' expectation damages, on which the court instructed the jury, but with the evidence of the plaintiffs' reliance damages. New York law provides for expectation damages as the remedy for breach of contract claims. As such, and as discussed supra, damages for breach of contract "are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed." Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C., 692 N.E.2d 551, 553 (N.Y. 1998). The court instructed the jury as much, consistent with the plaintiffs' requested instruction.[34] The plaintiffs did not object to this instruction. In awarding the plaintiffs "[z]ero dollars," the jury may reasonably have concluded that the plaintiffs failed to prove the amount of their damages by a preponderance of the evidence, that the plaintiffs failed to mitigate their damages, that the defendants breached the Operating Agreement in a manner that caused the plaintiffs no damages, or that any damages were caused by some other factor or combination of factors other than the defendants' breach.

---

[34] Jury Instructions (doc. no. 71) at 27.

The plaintiffs do not point to any undisputed evidence of <u>expectation</u> damages that a jury was compelled to award.  And to the extent that the plaintiffs put on any evidence of their expectation damages, the defendants vigorously disputed whether the plaintiffs could expect any particular form or amount of remuneration under the Operating Agreement when the evidence suggested that the Operating Agreement did not require, in Shlasinger's own words, "anyone to do anything."

Instead, plaintiffs contend that they introduced undisputed evidence of their <u>reliance</u> damages.  Specifically, they ask the court to award them, through additur, the $100,000 that Shlasinger invested in the business and $38,115 that Gerardi allegedly would have made through his reduced $30,000 salary over the 15 months remaining in the three years that he expected the store to be open.[35]  The plaintiffs' failure to seek relief under a theory of reliance damages at any time prior to their post-trial motions forecloses this relief.

The plaintiffs could have sought reliance damages from the beginning.  As they agreed at the final pretrial conference, in response to the defendants' motion in limine to exclude lost future profits, the plaintiffs' damages of that variety would be difficult to prove in light of the nascent nature of the

---

[35] Plaintiffs' Mem. (doc. no. 79) ¶ 17.

parties' business.  See Kenford Co., Inc. v Erie, 493 N.E.2d
234, 235 (N.Y. 1986) ("If it is a new business seeking to
recover for loss of future profits, a stricter standard is
imposed for the obvious reason that there does not exist a
reasonable basis of experience upon which to estimate lost
profits with the requisite degree of reasonable certainty.").
Given the difficulty of proving lost profits damages under those
circumstances, New York law provides that, "as an alternative to
expectation-based damages," under such circumstances, "a
plaintiff may recover 'damages based on his reliance interest,
including expenditures made in preparation for performance or in
performance, less any loss that the party in breach can prove
with reasonable certainty the injured party would have suffered
had the contract been performed.'" St. Lawrence Factory Stores
v. Ogdensburg Bridge & Port Auth., 918 N.E.2d 124, 125 (N.Y.
2009) (quoting Restatement (Second) of Contracts § 349).

But the plaintiffs did not request an instruction on
reliance damages.  Nor did their proposed jury instructions
account for reliance damages as an alternative.  To the
contrary, they solely requested an expectation damages
instruction to the effect that "[m]onetary damages" for breach
of contract are "designed in theory to put the injured party in
as good a position as he would have been put by a full

performance of the contract."[36]  Finally, though afforded ample opportunity, they never objected to the court's final instruction on expectation damages.  Having litigated under a theory of expectation damages, which the jury rejected, the plaintiffs cannot now obtain allegedly-undisputed reliance damages through Rule 59(e).

In their reply memorandum and at oral argument, the plaintiffs argued -- for the first time -- that the court's expectation damages instruction incorporated and accounted for reliance damages,[37] and that to construe it otherwise would constitute a manifest error of law.[38]  They contend that the court's instructions must be interpreted to account for those damages because the plaintiffs put on no evidence of future lost profits and consequential damages, leaving only reliance damages available to them.  In essence, the plaintiffs contend that the jury ought to have intuited that the plaintiffs could recoup money paid in reliance on the Operating Agreement despite the court's instruction (requested by the plaintiffs) to measure plaintiffs' damages as expectation-based.

---

[36] Plaintiffs' Proposed Jury Instructions (doc. no. 53) at 7-8.

[37] Plaintiffs' Reply (doc. no. 86) ¶¶ 7-18.

[38] Id. ¶¶ 19-26.

First, the court did not, as plaintiffs represent, grant the defendants' motion in limine to exclude evidence of plaintiffs' lost profits and consequential damages in light of plaintiffs' failure to produce an expert on the subject.[39] Rather, it terminated that motion as moot after the final pretrial conference during which the plaintiffs affirmatively represented that they would not present evidence of future lost profits or consequential damages.[40]  Notably, following that conference, the plaintiffs neither withdrew their request for an expectation damages instruction, nor requested a reliance damages instruction, nor requested any other clarification in the jury instructions.  Nor did the plaintiffs disclaim evidence of any other variety of expectation damages.

Second, and more importantly here, the jury is not obligated to intuit the plaintiffs' case.  If the plaintiffs sought an award of reliance damages, it was incumbent on the <u>plaintiffs</u> to request an instruction to that effect. Plaintiffs' failure to do so here is fatal to their post-trial request for reliance damages.

The plaintiffs' strategy for proving expectation damages was, of course, the plaintiffs' prerogative; their failure to do

---

[39] <u>See</u> Mot. in Limine (doc. no. 58).

[40] <u>See</u> Order of January 30, 2018.

so, and to request any jury instruction on any other type of
damages -- including reliance damages -- does not render the
court's damages instruction contrary to law.  Were the jury's
verdict internally inconsistent, inconsistent with the jury
instructions, or inconsistent with the evidence, the court would
be obligated to grant the plaintiffs a new trial (at least as to
damages).  Having concluded that the verdict is not
inconsistent, however, the court denies that motion.

**IV.  Plaintiffs' motion to adjust the jury award**

In the alternative, invoking Rule 59(e), the plaintiffs
have asked the court to "adjust the jury award in Count II of
the jury verdict to correct" what they characterize as "the
manifest error in the Jury's zero dollar damages award."[41]  While
the jury cannot be said to have erred, since it did not receive
an instruction on nominal damages, the plaintiffs are
nevertheless entitled under New York law to an award of nominal
damages.  The court therefore grants their motion and awards
them $1.

"Rule 59(e) permits a motion to alter or amend the judgment
to be brought within 28 days next following the entry of
judgment. . . . It does not list specific grounds for affording
relief but, rather, leaves the matter to the sound discretion of

_____

[41] Plaintiffs' Mem. (doc. no. 79) ¶ 13.

the district court." Ira Green, Inc. v. Military Sales & Serv. Co., 775 F.3d 12, 28 (1st Cir. 2014). The court must exercise this discretion "with considerable circumspection: revising a final judgment is an extraordinary remedy and should be employed sparingly." Id. Thus, to obtain relief under Rule 59(e), the plaintiffs "must demonstrate either that new and important evidence, previously unavailable, has surfaced or that the original judgment was premised on a manifest error of law or fact." Id. And while parties may not normally invoke Rule 59(e) "to raise arguments which could, and should, have been made before the judgment issued,"[42] Harley-Davidson Motor Co. v. Bank of New England-Old Colony, N.A., 897 F.2d 611, 616 (1st Cir. 1990) (internal quotation omitted), the court has "substantial discretion in deciding whether to . . . allow the losing party to argue new material or a new theory," Appeal of Sun Pipe Line Co., 831 F.2d 22, 25 (1st Cir. 1987).

"In a civil jury trial, the jury customarily must determine the damages that the plaintiff has sustained." Campos-Orrego v. Rivera, 175 F.3d 89, 96 (1st Cir. 1999). "[T]he Seventh Amendment flatly prohibits federal courts from augmenting jury

---

[42] As discussed supra Parts III.B-C, the plaintiffs did not request an instruction on restitution damages -- which they now seek through additur -- or object to the court's instructions during trial.

verdicts by additur." Id. at 97 (citing Dimick v. Schiedt, 293 U.S. 474, 486–87 (1935)).  "[T]he constitutional rule against additur is not violated," however, "in a case where the jury has properly determined liability and there is no valid dispute as to the amount of damages.  In such a case the court is in effect simply granting summary judgment on the question of damages." Decato v. Travelers Ins. Co., 379 F.2d 796, 798 (1st Cir. 1967) (internal citations omitted).

Here, the plaintiffs contend, and the defendants do not dispute, that the jury has properly determined liability.  The question is the measure of damages, if any, to which the plaintiffs are entitled.

In awarding the plaintiffs no damages on their breach of contract claim, the jury concluded that the plaintiffs failed to prove the amount of their expectation damages by a preponderance of the evidence.  As discussed <u>supra</u> Part III.C, the plaintiffs do not argue that this conclusion was against the weight of the evidence.  And, also as discussed <u>supra</u> Parts III.B-C, the plaintiffs' strategic choices foreclose an award of reliance damages.  The court is thus disinclined to disturb that verdict by awarding the plaintiffs a measure of damages on which they sought no instruction at trial.

Under New York law, however, the plaintiffs are yet entitled to <u>some</u> damages following from the jury's conclusion

that the defendants breached the Operating Agreement.  "[I]t is a well-settled tenet of [New York] contract law that even if the breach of contract caused no loss or if the amount of loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any."  Hirsch Elec. Co. v. Cmty. Servs., Inc., 536 N.Y.S.2d 141, 142 (N.Y. App. Div. 1988). Accordingly, the jury's verdict -- while internally consistent and consistent with the given instructions -- is contrary to settled New York law insofar as the plaintiffs are entitled to, but did not receive, a nominal damages award.[43]  The court therefore amends the judgment, awarding the plaintiffs nominal damages in the amount of $1.

## V.  Plaintiffs' motion for new trial based on juror conduct

Finally, the plaintiffs seek a new trial, alleging that a juror committed misconduct by failing to disclose a connection between his employer, the Associated General Contractors of New Hampshire (AGCNH), and the defendants' counsel's firm, Orr & Reno, P.A.[44]  After holding an evidentiary hearing, see United States v. Pagán-Romero, 894 F.3d 441, 448 (1st Cir. 2018), the court concludes that the juror's actions do not constitute

---

[43] Neither party requested an instruction on nominal damages.

[44] Plaintiffs' Mem. (doc. no. 79) ¶¶ 39-58.

grounds for a new trial and, accordingly, denies the plaintiffs'
motion.

Though the juror in question did not disclose any
connection between his employer and Orr & Reno during jury
selection or trial, he was familiar with that law firm, which
was a member of AGCNH between 2012 and 2016.[45]  An attorney from
Orr & Reno addressed AGCNH's annual luncheon in February 2016.[46]
Despite a solicitation phone call from the juror in summer or
fall of 2017, Orr & Reno did not renew its membership[47] or pay
any dues to AGCNH after June 2016,[48] and thus was not a member of
AGCNH during the trial of this action in January 2018.

Though the plaintiffs uncovered this former association
only after the trial, the information underlying their motion
was available to them before trial.  Specifically, though Orr &
Reno was no longer a member, AGCNH's website listed it under the
heading "Attorneys" as well as the heading "Affiliates."[49]  And
the juror's completed questionnaire identified AGCNH as his

---

[45] See also Mason Aff't (doc. no. 82-2) ¶ 2.

[46] Plaintiffs' Mot. Ex. D (doc. no. 79-4); Laboe Aff't (doc.
no. 82-1) ¶ 2.

[47] Laboe Aff't (doc. no. 82-1) ¶ 3.

[48] Mason Aff't (doc. no. 82-2) ¶ 3.

[49] Plaintiffs' Mot. Exs. A-B (doc. nos. 79-1 and 79-2).

employer.,[50]  Though they raised no objection before or during voir dire, the plaintiffs argue that this association necessarily biased the juror in the defendants' favor, thus warranting a new trial.

To obtain a new trial under these circumstances, the plaintiffs "must satisfy a binary test." Sampson v. United States, 724 F.3d 150, 164 (1st Cir. 2013).  They "must show, first, that the juror failed to answer honestly a material voir dire question," and then that "a truthful response to the voir dire question 'would have provided a valid basis for a challenge for cause.'" Id. at 164-65 (quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984)).  The plaintiffs have not satisfied either element of the test.

First, the juror did not fail to answer honestly a question on voir dire.  During general voir dire, the court asked only one question concerning the lawyers in this case that could arguably have received a positive response from this juror:

> Have any of the lawyers in this case, or any members of their law firms (partners or associates), ever represented your interests, or those of a member of your immediate family--or a party adverse to those interests--in any matter?

At the evidentiary hearing, the juror confirmed that Orr & Reno had never represented AGCNH or the juror, personally, or acted

---

[50] Juror Questionnaire (doc. no. 59) at 154.

as their attorneys in any matter.  That being the case, the
juror did not incorrectly answer this question in the negative
or withhold an honest response. [51]

The plaintiffs contend that the juror incorrectly answered
a question that he never was asked -- specifically, a question
"regarding any potential relationships and/or familiarity with
the lawyers or law firms for either of the parties."[52]  Even had
the court asked that question -- which it did not -- the juror's
silence in response may not have constituted a failure to answer
that question honestly because, at that time, the juror had not
been informed that defendants' counsel were associated with Orr
& Reno.  He testified that he was not personally familiar with
the attorneys from that firm who represented the defendants at
trial and that he did not know the name of their law firm until
they disclosed it.  The trial transcript establishes that
defendants' counsel did not identify his law firm by name until

---

[51] At the July 17 hearing, defendants' counsel disclosed that he
was aware, during voir dire, that a potential juror was
associated with AGCNH and that his law firm had been a past
member of AGCNH.  While counsel may not have been obligated to
disclose that former connection, a better course of action would
have been to disclose his firm's prior, public connection with
the juror's employer during voir dire, allowing the court and
plaintiffs' counsel to address this issue at that time.

[52] Plaintiffs' Mem. (doc. no. 79) ¶ 41.

attorney-conducted voir dire, after the cause challenges had been ruled on but before peremptory challenges.[53]

Even if the juror had both the knowledge and the duty to disclose the connection between his employer and Orr & Reno, the plaintiffs have not established that this information, if made available to them during voir dire, "would have provided a valid basis for a challenge for cause." Sampson, 724 F.3d at 165. In response to the court's questions,[54] the juror testified that, had he been questioned on the issue during voir dire, he would have responded that: (1) the former association would not affect his ability to fulfill his duties as a juror; (2) it would not have made him more sympathetic to one side or the other; (3) he would have been able to decide the case on the facts as he found them, without regard to that prior association; and (4) he would not have viewed himself as being in a position to help Orr & Reno so as to obtain renewal of their former membership.

---

[53] Though defendants' counsel represented and the juror testified at the July 17 hearing that counsel identified his law firm while the juror was seated with the rest of the venire in the gallery, the transcript conclusively establishes that this was not the case.

[54] The plaintiffs, though afforded an opportunity to question the foreman at the hearing, declined it.

In the face of these responses, at oral argument, the plaintiffs fell back on the position that, even though the juror's answers would not have supported dismissal for cause, human nature suggests that some bias may have existed. On this record, and under the facts and circumstances present here, human nature alone would not have constituted a valid basis for a cause challenge. Accordingly, in light of the evidence adduced at the July 17 hearing, which overwhelmingly suggested that the juror would be able to set aside his former association with the defendants' counsel and conduct himself as a juror without bias in favor of either side, the plaintiffs have not met the burden of demonstrating a valid challenge for cause.

The plaintiffs insinuate that any bias on the juror's part was amplified by, or that he may have exerted undue influence as a result of, his position as foreperson.[55] Having found no potential for bias, the court cannot conclude that the juror's position in any way exacerbated it. In any event, the court instructed the jury that the verdict "must represent the considered judgment of each juror" and that the foreperson merely acts "very much like the chairperson of a committee, seeing to it that the deliberations are conducted in an orderly fashion and that each juror has a full and fair opportunity to express his

---

[55] See Plaintiffs' Mem. (doc. no. 79) ¶¶ 52, 55.

or her views, positions and arguments on the evidence and on the law."[56]  The court assumes those instructions were followed.  See Richardson, 481 U.S. at 206 (1987).  The defendants offer no authority to the contrary, and this is not an issue that permits inquiry into the jury's actual deliberations under the Federal Rules of Civil Procedure or Evidence.  See Fed. R. Evid. 606(b); United States v. Connolly, 341 F.3d 16, 34 (1st Cir. 2003) ("[c]ourts generally 'should be hesitant[ ] to haul jurors in after they have reached a verdict . . . to probe for potential instances of bias, misconduct, or extraneous influences.'" (quoting Neron v. Tierney, 841 F.2d 1197, 1205 (1st Cir. 1988))).

Finally, the court affords no credence to plaintiffs' allegation that the juror, when individually questioned by plaintiffs' counsel as to his profession, "provided both a false and misleading answer, leading Plaintiffs' counsel to believe he owned a construction company and [was] not an executive for AGCNH . . . ."[57]  The juror disclosed on his juror questionnaire that he was employed as an Association Executive by AGCNH.[58]  In

---

[56] Jury Instructions (doc. no. 71) at 33.

[57] Plaintiffs' Mem. (doc. no. 79) ¶ 54.

[58] Juror Questionnaire (doc. no. 59) at 154.  Notably, as they conceded at the evidentiary hearing, neither of plaintiffs' counsel had reviewed the juror questionnaires before voir dire, though they were docketed on January 19, 2018, four days before

that role, he indicated, he managed the association and was registered as a lobbyist.[59]  Under plaintiffs' counsel's questioning, he reiterated that he was the "CEO of a construction association."  At no time did he claim to own a construction company.  Though plaintiffs' counsel may have, in good faith, misconstrued the juror's answers, counsel's flawed recollection or comprehension does not amount to juror misconduct.

## VI.  Defendants' motion for attorneys' fees

Finally, the defendants have moved for an award of attorneys' fees.  "It is axiomatic that, under the 'American Rule,' each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise."  In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d 4, 13 (1st Cir. 2012).  Here, the defendants invoke a contract -- the Store Agreement.  That agreement provides:

> In any action or proceeding between or among the parties hereto to interpret or enforce any provisions hereof, the prevailing party shall, in addition to any

---

jury selection on January 23.  Attorney Davidow's representation at that hearing that he was not afforded time to review the questionnaires because they were docketed during his flight to New Hampshire is therefore not well-taken by the court.

[59] Id.

> other award of damages or other remedy, be entitled to
> reasonable attorney's fees and costs.[60]

The court denies the defendants' motion because neither claim in this action appears to fall within the ambit of the Store Agreement's fees provision.

First, this action was not one "to interpret or enforce any provisions" of the Store Agreement.[61]  As the defendants took great and careful pains to establish at trial, Shlasinger and Gerardi did not bring any claim for breach of the Store Agreement.  Indeed, the defendants objected to Gerardi's testimony that he believed the defendants had breached the Store Agreement.  The court, sustaining that objection, instructed the jury that the only claims at issue concerned the Operating Agreement.  Nor did the plaintiffs claim or allege fraud in the inducement of the Store Agreement.

Nor, arguably, was this an action "between or among the parties" to the Store Agreement.  The parties to the Store Agreement were ZaP'D Games and Myriad Games.  While Myriad Games was, in fact, a defendant in this action, ZaP'D Games was not a party.  Thus, the Store Agreement's fees-shifting provision does not apply to this action.

---

[60] Tr. Ex. 14 ¶ 24.

[61] Id.

Finally, even if that provision applied here, the defendants are not entitled to fees as the "prevailing party." The term "prevailing party," whether arising in statute or contract, is a "legal term of art." Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res., 532 U.S. 598, 603 (2001). "To be considered a prevailing party, a party must be 'awarded some relief by the court'" and "must also show (1) a 'material alteration of the legal relationship of the parties' and (2) a 'judicial imprimatur on the change.'" Castañeda-Castillo v. Holder, 723 F.3d 48, 57 (1st Cir. 2013) (internal citations omitted). A "judgment on the merits" satisfies these criteria. Id. (citing Buckhannon, 532 U.S. at 605).

Accordingly, the defendants may have prevailed on the plaintiffs' claim for fraud in the inducement, but in light of the court's decision supra, the plaintiffs prevailed on their claim for breach of contract. See Farrar, 506 U.S. at 113 (nominal damages award renders the plaintiffs prevailing party). Where each side has prevailed on one of the plaintiffs' two claims, neither side is entitled to its attorneys' fees. Cf. Estate of Hevia v. Portrio Corp., 602 F.3d 34, 46 (1st Cir. 2010) (neither side entitled to costs where both arguably prevailed).

## VII. <u>Conclusion</u>

The court rules as follows on the parties' post-trial motions:

- The plaintiffs' motion for judgment as a matter of law under Rule 50[62] is DENIED.

- The plaintiffs' motion for a new trial under Rule 59(a)(1)[63] is DENIED.

- The plaintiffs' motion to amend the judgment under Rule 59(e)[64] is GRANTED; judgment is amended in the plaintiffs' favor by $1.

- The defendants' motion for attorneys' fees[65] is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:    August 15, 2018

cc:  Joseph A. Davidow, Esq.
     Howard A. Roever, Esq.
     Robert S. Carey, Esq.
     Lindsay Nadeau, Esq.

---

[62] Document no. 66, 79.

[63] Document no. 79.

[64] Document no. 79.

[65] Document no. 75.